**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**ZACHARY BUTCHINO,**

                                    **Plaintiff,**

          **vs.**                                                    **8:20-cv-796**
                                                                     **(MAD/CFH)**

**CITY OF PLATTSBURG, CHAD WELCH, ADAM**
**WOOD, JOSHUA POND, KRISTOPHER**
**MINOGUE, JOEL VASSAR, LEVI**
**RITTER,**

                                    **Defendants.**
_____

APPEARANCES:                              OF COUNSEL:

**KAUFMAN LIEB LEBOWITZ**                 **DOUGLAS EDWARD LIEB, ESQ.**
**& FRICK LLP**
10 East 40th Street, Suite 3307
New York, New York 10016
Attorneys for Plaintiff

**FITZGERALD MORRIS BAKER**               **STEPHANIE McDERMOTT, ESQ.**
**FIRSH, P.C.**                           **JOHN D. ASPLAND, ESQ.**
68 Warren Street
Glens Falls, New York 12801
Attorneys for Defendants

**Mae A. D'Agostino, U.S. District Judge:**

### MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

On July 15, 2020, Plaintiff Zachary Butchino initiated this lawsuit against Defendants

Chad Welch, Adam Wood, Joshua Pond, Kristopher Minogue, Joel Vassar, Levi Ritter

(collectively, "Defendant Officers"), and the City of Plattsburg. *See* Dkt. No. 1. Plaintiff alleges

excessive force and failure to intervene claims against the Defendant Officers, and *Monell*

1

liability as well as violations of Title II of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act against Defendant City. Specifically, Plaintiff's claims arise out of the force used against him by Defendant Officers on August 19, 2017, while in custody, in an effort to remove his shorts as a suicide prevention measure. Presently before the Court is Defendant's motion for summary judgment. Dkt. No. 27.

## II. BACKGROUND

Plaintiff Zachary Butchino enlisted in the United States Army in 2007 and served in Afghanistan in 2009 and 2010. *See* Dkt. No. 33-1 at ¶¶ 5-6. In 2013, Plaintiff was diagnosed with post-traumatic stress disorder ("PTSD"). *Id.* at ¶ 124. On August 19, 2017, Plaintiff was arrested for assault by the Plattsburgh Police Department following a night of drinking. *Id.* at ¶¶ 122, 126. Plaintiff eventually pleaded guilty to a one-year conditional discharge for the assault charge. *Id.* at ¶ 123.

Following the assault and arrest, Plaintiff arrived at the Plattsburgh police station at approximately 3:21 a.m. *Id.* at ¶¶ 128, 130. Plaintiff was searched for weapons and contraband, and then placed in Cell 1. *Id.* at ¶ 11. Due to available surveillance video, most events in the jail are undisputed. From 3:54 a.m. to 4:06 a.m., while in Cell 1, Plaintiff repeatedly requested his medication, requested a phone call, and shook the cell door. *Id.* at ¶¶ 81-91. Plaintiff then began to sing about the disturbing violence he experienced while serving in Afghanistan, including "I killed a lot of people/they almost killed a lot of my people/my friend in Georgia is dead because [incomprehensible]/you should give me my medication/to prevent me from killing more people." *Id.* at ¶¶ 92, 95.

At 4:20 a.m., Plaintiff began to cry in his cell. *Id.* at ¶ 96. At 4:41 a.m., Plaintiff removed his shorts, placed one leg of his shorts over his head and tied the other leg of the shorts to the cell.

*Id.* at ¶¶ 96-99.  Following the apparent suicide attempt, Plaintiff refused to hand over his shorts to an officer, and instead put them back on.  *Id.* at ¶ 101.

Defendant Officers subsequently moved Plaintiff to Cell 4 so Defendants could more easily monitor his behavior.  *Id.* at ¶ 135.  Throughout the transfer to Cell 4, Plaintiff was combative and struggled with Defendant Officers.  *Id.* at ¶¶ 104-09.  Plaintiff, once in Cell 4, still refused to comply with an order to remove his shorts.  *Id.* at ¶ 112.  Approximately fourteen seconds after Plaintiff was secured in Cell 4, Defendant Welch re-opened Plaintiff's cell, brandished a taser, and demanded Plaintiff remove his shorts.  *Id.* at ¶¶ 222-23.  Plaintiff, however, attempted to hold the door closed.  *Id.* at ¶ 112.  Defendants Welch, Wood, Pond and Minogue then opened the door and entered the cell.  *Id.* at ¶¶ 113-14.  Defendant Vassar stood at the back of the group outside the door of the cell.  *Id.* at ¶ 115.  Defendant Ritter observed the other Defendant Officers from behind a nearby desk in the booking room.  *Id.* at ¶¶ 186-87.

The next fifty-six seconds, where the four officers were in his cell, are difficult to discern on the video.  Defendants Welch, Wood and Pond were all near Plaintiff's torso and face, while Defendant Minogue successfully removed Plaintiff's shorts.  *Id.* at ¶ 146.  At the end, Plaintiff's face was visibly bloody.  *Id*. at ¶ 119.  Plaintiff testified that he was punched approximately ten times and was ultimately diagnosed with a deviated septum.  *Id.* at ¶¶ 25, 163.  Defendant Welch, however, testified that he punched Plaintiff twice, and no other Defendant stated that they punched Plaintiff.  *Id.* at ¶ 167.  Additionally, it is undisputed that Defendant Wood "pulled on and squeezed" Plaintiff's genitals after Plaintiff's shorts had been removed.  *Id.* at ¶ 169.

Following the incident, in a recorded conversation, Defendant Vassar told Plaintiff:

> Ultimately, we don't want anybody getting hurt.  We just want you
> back in the cell; we want you to be safe.  We want you to be able to
> relax if you can—and I get that being in this room is not relaxing,

> and I understand that—but there's no way prior to this that we could
> have known that that would have set off PTSD.  You know what I
> mean?  We knew of your PTSD because we were informed of that
> by you.  But we didn't know that being in that cell was going to
> trigger that.  OK?  Once we realized that it had triggered that,
> because of your up-and-down-mood and an attempt to hang
> yourself, we knew we had to act.  And that's what we did.  That's
> what our attempt was, was to act—was actually to protect you, not
> to hurt you.

*Id.* at ¶ 212.

## III. DISCUSSION

### A.    Standard of Review

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law.  *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994).  When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried."  *Id.* at 36–37 (quotation and other citation omitted).  Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions on its pleadings.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56 (c), (e)).

In assessing the record to determine whether any such issues of material fact exist, the Court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party.  *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).  Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather the Court must be satisfied that the citations to evidence in the record support the movant's assertions.  *See Giannullo v. City of New York*, 322 F.3d 139, 143 n.5 (2d

Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary

judgment "would derogate the truth-finding functions of the judicial process by substituting

convenience for facts").

"'Assessments of credibility and choices between conflicting versions of the events are

matters for the jury, not for the court on summary judgment.'" *Jeffreys v. City of New York*, 426

F.3d 549, 553–54 (2d Cir. 2005) (quotation omitted).  "However, '[t]he mere existence of a

scintilla of evidence in support of the plaintiff's position will be insufficient; there must be

evidence on which the jury could reasonably find for the plaintiff.'" *Id.* (quoting *Anderson*, 477

U.S. at 252).  "To defeat summary judgment, therefore, nonmoving parties 'must do more than

simply show that there is some metaphysical doubt as to the material facts', ... and they may not

rely on conclusory allegations or unsubstantiated speculation.'" *Id.* (quotations omitted).

**B.    Excessive Force**

Plaintiff brings a Section 1983 claim for use of excessive force under the Fourteenth

Amendment's Due Process Clause.  "[T]he Due Process Clause protects a pretrial detainee from

the use of excessive force that amounts to punishment." *Graham v. Connor*, 490 U.S. 386, 395

n.10 (1989).  The Supreme Court has held that "pretrial detainees (unlike convicted prisoners)

cannot be punished at all." *Kingsley v. Hendrickson*, 576 U.S. 389, 400 (2015).  "An officer's

actions can amount to punishment if they are taken with 'an expressed intent to punish.'" *Frost v.

New York City Police Dep't*, 980 F.3d 231, 252 (2d Cir. 2020) (quoting *Bell v. Wolfish*, 441 U.S.

520, 538, (1979)).  Alternatively, in the absence of an expressed intent to punish, "a pretrial

detainee can nevertheless prevail by showing that the actions are not rationally related to a

legitimate nonpunitive governmental purpose or that the actions appear excessive in relation to

that purpose." *Kingsley*, 576 U.S. at 398.  "[T]he appropriate standard for a pretrial detainee's

excessive force claim is solely an objective one." *Id.* at 397.  A pretrial detainee "must show only that the force purposely or knowingly used against him was objectively unreasonable." *Id.* at 396–97.  The "objective reasonableness" standard "turns on the facts and circumstances of each particular case." *Frost*, 980 F.3d at 252 (citing *Kingsley*, 576 U.S. at 397).

First, Plaintiff asks this Court to infer an express intent to punish because Defendants Welch and Wood lied about their behavior in reports and internal interviews.  *See* Dkt. No. 33 at 12-13.  Plaintiff argues that "[i]t is eminently reasonable to infer that Welch and Wood would not have gone to such great lengths to conceal the force they used if they had used it for legitimate reasons." *Id.* at 13.  Such an inference, however, does not relate to whether they acted with an express intent to punish.  There is no subjective element to a Fourteenth Amendment excessive force claim.  *Kingsley*, 576 U.S. at 396.  "[W]e may only infer that Defendants acted with punitive intent if the challenged conditions were not reasonably related to a legitimate goal—if [they were] arbitrary or purposeless." *Turkmen v. Hasty*, 789 F.3d 218, 238 (2d Cir. 2015*), judgment rev'd and vacated on other grounds Ziglar v. Abbasi*, —U.S.—, 137 S. Ct. 1843 (2017) (internal citation and quotations omitted).

Plaintiff, however, establishes a dispute of a material fact regarding whether "the force purposely or knowingly used against him was objectively unreasonable." *Kingsley*, 576 U.S. at 396–97.  Following a suicide attempt, Defendant Officers Welch, Wood, Pond and Minogue removed Plaintiff's shorts to alleviate the suicide risk of the short's drawstring.  Dkt. No. 33-1 at ¶¶ 60, 64-65.  Plaintiff, however, asserts that the "objectively unreasonable" nature of the force used demonstrates that the true purpose was to "punish and/or retaliate against him." Dkt. No. 33 at 7.

In *Kingsley*, the Supreme Court provided the following non-exhaustive factors to determine whether a defendant applied force reasonably:

> the reasonableness or unreasonableness of the force used: the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Id.* The factfinder must also "take account of the legitimate interests in managing a jail, acknowledging as part of the objective reasonableness analysis that deference to policies and practices needed to maintain order and institutional security is appropriate." *Frost*, 980 F.3d at 252. Here, "resolv[ing] all ambiguities and draw[ing] all permissible factual inferences in favor of the party against whom summary judgment is sought," *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004), the Court finds material issues of fact regarding the amount and necessity of force preclude summary judgment.

Plaintiff was alone in a secured environment and had already been searched for weapons. Dkt. No. 33-1 at ¶ 11. Four officers entered Plaintiff's cell to remove his shorts, and two more were present immediately outside. *Id.* at ¶ 114. Although Plaintiff resisted the officers, he did not punch or strike the officers. *Id.* at ¶¶ 160-62. In his testimony, Defendant Welch identified at least two punches that he threw after Plaintiff's shorts had already been removed. Dkt. No. 27-5 at 364. And Defendant Wood testified he grabbed Plaintiff's genitals after Defendant Welch had already punched Plaintiff, and after Plaintiff's shorts had been removed. Dkt. No. 27-6 at 70.

Plaintiff repeatedly testified at his deposition that he was punched approximately ten times, although he did not count exactly, and that Defendant Wood pulled and squeezed Plaintiff's genitals, causing immense pain. Dkt. No. 33-1 at ¶¶ 163, 166. After the incident, Plaintiff's face

was covered in blood, swollen, and bruised. *Id.* at ¶ 119; Dkt. No. 42-1 at 8-11. Plaintiff was

eventually diagnosed with a deviated septum. *Id.* at ¶ 25. Following the incident, Chief Ritter

stated, "not all" of the force used by Defendants against Plaintiff "was justified." *Id.* at ¶ 178.

Defendants argue that Plaintiff's injuries are *de minimis*, and therefore Defendants' actions

cannot be objectively unreasonable. The Second Circuit, however, has held that multiple facial

bruises and a ruptured eardrum supported a Fourteenth Amendment excessive force claim. *Frost*,

980 F.3d at 254. The Court finds a deviated septum sufficiently analogous to a ruptured eardrum.

Additionally, the *Frost* court weighed the ruptured eardrum despite the plaintiff's previous

diagnosis of a ruptured eardrum the year prior. *Id.* Here, Defendants argue "it is unlikely that

Plaintiff's deviated septum can be attributed to the incident without engaging in speculation."

Dkt. No. 42 at 7. However, "absent undisputed medical evidence to the contrary—which

defendants have not offered—a reasonable jury could find that" Defendants were responsible for

causing a new injury. *Frost*, 980 F.3d at 254.

Defendants further argue that the officers' safety concerns justify the amount of force

used. Plaintiff had been arrested earlier that evening for assault and was singing about killing

people while in his cell. Dkt. No. 33-1 at ¶¶ 92, 95, 122. Plaintiff refused the order to remove his

shorts and then resisted the Defendant Officers' attempt to remove the shorts. Nonetheless,

Plaintiff was alone, had already been searched, and was secured in a cell. When the strikes

occurred, Plaintiff was outnumbered four to one and pinned down.

To be sure, safety concerns coupled with refused orders may justify the use of force. *See,

e.g.*, *Berman v. Williams*, No. 17-CV-2757, 2019 WL 4450810, *6 (S.D.N.Y. Sept. 17, 2019)

(finding use of force justified where defendant refused to remove clothing in the search intake

area); *Hilson v. Maltese*, No. 9:09-CV-1373, 2012 WL 6965105, *7 (N.D.N.Y. Dec. 14, 2012),

*report and recommendation adopted*, 2013 WL 375489 (N.D.N.Y. Jan. 30, 2013) (finding force to be reasonably necessary to restore order during a strip frisk); *Allaway v. McGinnis*, 473 F. Supp. 2d 378, 382 (W.D.N.Y. 2007) (finding use of force justified where the plaintiff "charged at" officers). But here, unlike *Berman* and *Hilson*, Plaintiff had already been searched and was in a secured environment. Considering the facts in the light most favorable to Plaintiff, the Court, therefore, finds ten punches resulting in facial bruising and a deviated septum, as well as continued force, including the grabbing of genitals after compliance had been achieved, against a detainee who had already been searched for weapons, was in a secured environment, and did not attempt to punch or kick any officers, to be objectively unreasonable.

Defendants also argue that there is no evidence to support the personal involvement of against Defendants Minogue and Pond.[1]  In *Scott v. Harris*, 550 U.S. 372 (2007), the Supreme Court made clear that video evidence submitted in connection with a party's summary judgment motion should be considered in determining whether material issues of fact exist. "When opposing parties tell two different stories, one of which is blatantly contradicted by the [video] record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* at 380; *Hulett v. City of Syracuse*, 253 F. Supp. 3d 462, 482 (N.D.N.Y. 2017) ("*Scott* is best understood to permit the summary adjudication of a plaintiff's civil rights claim only in those exceptional cases where the video evidence in the record is sufficient to 'blatantly contradict[ ]' one party's version of events"). Here, the video evidence conclusively establishes that Defendant Minogue did not strike Plaintiff in the face. Defendant Minogue is near Plaintiff's legs for the entire fifty-four seconds. The only

---

[1] Plaintiff has agreed to voluntarily dismiss the excessive force claim against Defendant Vassar. *See* Dkt. No. 33 at 16 n.3.

other alleged injury is to Plaintiff's genitals and the parties agree that action was performed by

Defendant Welch.  Therefore, the excessive force claim is dismissed against Defendant Minogue.

Defendant Minogue did not strike Plaintiff in the face or grab his genitals, the only injuries

alleged in the complaint.

The video, however, does not conclusively establish Defendant Pond's actions.  It is

impossible to discern the amount of force he used or any other actions taken.  Accordingly, a

reasonable jury could find that Defendant Pond also used excessive force against Plaintiff,

including unnecessary and gratuitous punching.  *See, e.g.*, *Moore v. Keller*, 498 F. Supp. 3d 335,

351 (N.D.N.Y. 2020) ("Upon review, the video does not conclusively establish much. …

Accordingly, the appropriate course of action is still to permit the jury an opportunity to resolve

the competing versions of events") (quotations omitted).  Therefore, Defendant Pond's motion for

summary judgment on the excessive force claim is denied.

### 2. Qualified Immunity

Defendants further assert that Defendants Wood, Welch, Pond, and Minogue are shielded

from liability based on qualified immunity.

Qualified immunity is an affirmative defense and, as such, Defendants bear the burden of

proving that the privilege of qualified immunity applies.  *See Coollick v. Hughes*, 699 F.3d 211,

219 (2d Cir. 2012).  "Under the doctrine of qualified immunity, 'government officials performing

discretionary functions generally are shielded from liability for civil damages insofar as their

conduct does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known.'"  *Tracy v. Freshwater*, 623 F.3d 90, 95-96 (2d Cir. 2010)

(quoting *Kelsey v. County of Schoharie*, 567 F.3d 54, 60-61 (2d Cir. 2009)).  The Court is mindful

that qualified immunity is "'an entitlement not to stand trial or face the other burdens of

litigation,'" and that this privilege is "'effectively lost if a case is erroneously permitted to go to trial.'" *Saucier v. Katz*, 533 U.S. 194, 200 (2001) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).

Courts engage in a two-part inquiry to determine whether the doctrine of qualified immunity bars a suit against government officials. *See Jones v. Parmley*, 465 F.3d 46, 55 (2d Cir. 2006). First, a court must consider whether the facts, construed in favor of the party asserting the injury, "demonstrate a violation of a constitutional right." *Id.* (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Second, a court must also determine "whether the officials' actions violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Id.* (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). Courts may exercise their discretion in deciding which prong should be considered first. *See Pearson v. Callahan*, 555 U.S. 223, 243 (2009).

"It is well established that qualified immunity may operate as a defense to excessive force claims." *Betts v. Rodriquez*, No. 15-CV-3836, 2017 WL 2124443, *4 (S.D.N.Y. May 15, 2017). "Even if the force is objectively unreasonable, an officer may still be eligible for qualified immunity if it was objectively reasonable for the officer to believe that her action did not violate clearly established law." *Keene v. Schneider*, 350 Fed. Appx. 595, 596 (2d Cir. 2009). "The Supreme Court has made clear that officers who have used excessive force may be entitled— under the qualified immunity doctrine—to an extra layer of protection 'from the sometimes hazy border between excessive and acceptable force.'" *De Michele v. City of New York*, No. 09-CV-9334, 2012 WL 4354763, *17 (S.D.N.Y. Sept. 24, 2012) (quoting *Saucier*, 533 U.S. at 206).

The contested amount and necessity of force in this case makes summary judgment on qualified immunity inappropriate. *See, e.g.*, *Kerman v. City of New York*, 261 F.3d 229, 240 (2d

Cir. 2001) (holding that "summary judgment on qualified immunity grounds is not appropriate when there are facts in dispute that are material to a determination of reasonableness") (citation omitted).  Construing the facts in Plaintiff's favor, Defendants struck Plaintiff in the face and grabbed his genitals after he had been restrained and stopped resisting.  It is clearly established law that once "restrained by five police officers inside the familiar terrain and relative safety of a police precinct interrogation room," repeated punches may "constitute excessive force."  *Gardner v. Robinson*, No. 16-CIV-1548, 2018 WL 722858, *6 (S.D.N.Y. Feb. 6, 2018); *Lennox v. Miller*, 968 F.3d 150, 157 (2d Cir. 2020) (holding that it is "clearly established by our Circuit caselaw that it is impermissible to use significant force against a restrained arrestee who is not actively resisting").  Even if Plaintiff did initially resist, it is equally well established that "gratuitous force after resistance has stopped and compliance has been secured is unreasonable."  *Lee v. City of Troy*, 520 F. Supp. 3d 191, 207 (N.D.N.Y. 2021) (citing *Lennox*, 968 F.3d at 157).

Accordingly, due to the factual dispute over the level of force used by Defendants and Plaintiff's level of resistance, as well as the timing of the alleged excessive force, the Court will not grant Defendants qualified immunity.

**C.      Failure to Intervene**

Plaintiff alleges that Defendant Officers failed to intervene in the August 19, 2017, incident.  "It is widely recognized that law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence."  *Terebesi v. Torreso*, 764 F.3d 217, 243 (2d Cir. 2014) (quoting *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)).  To establish a claim of failure to intervene a plaintiff must prove:

> (1) that a constitutional violation was being committed against the plaintiff; (2) that the officer knew, or deliberately ignored, the fact that the constitutional violation was going to be, or was being, committed; (3) that the defendant had a reasonable opportunity to intervene and prevent the harm; and (4) that the defendant did not take reasonable steps to intervene. *Curley v. Vil. of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001)

*Alexander v. Nolan*, No. 6:17-CV-0725, 2018 WL 6621400, *7 (N.D.N.Y. Dec. 18, 2018).  The first element, as discussed above, is met.  Defendant Officers argue that they did not have actual knowledge of the force being used by other officers.  Indeed, each of these officers testified that they did not know what force was being used.  *See* Dkt. No. 27 at 34-35.  Additionally, Defendant Officers argue that they did not have a realistic opportunity to intervene given the suddenness of any force.

After review of the video, the Court disagrees.  First, a reasonable jury could find that Defendants Wood, Welch, Pond, and Minogue had knowledge of the force and a reasonable opportunity to intervene.  The four officers were in close proximity in the cell together for fifty-four seconds as the incident unfolded.  A reasonable jury could infer knowledge of force based on the video, despite the officers' testimony.  Second, Defendant Vassar, although he was standing immediately outside of the cell, testified that he watched the incident occur.  Dkt. No. 27-6 at 148.  And third, Defendant Ritter was behind a desk in the booking room, where Cell 4 was visible.  Dkt. No. 27-5 at 135-136.  Defendant Ritter testified that he watched the incident for "about 45 seconds" from behind the desk.  *Id.*  Because it is undisputed that each Defendant Officer watched the events transpire, a reasonable jury could infer that they had knowledge of the force being used.

"Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence,

a reasonable jury could not possibly conclude otherwise." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994). Defendants argue that Defendant Welch's two punches and Defendant Wood's grabbing of Plaintiff's genitals were too sudden to allow any officer an opportunity to intervene. Plaintiff, however, testified that he was punched approximately ten times over the fifty-four second incident.

In *Figueroa v. Mazza*, the Second Circuit held that a factual dispute over the length of an excessive force incident and the amount of punches thrown precluded judgment as a matter of law for the defendants on a failure to intervene claim. 825 F.3d 89, 106-07 (2d Cir. 2016). The court concluded that the plaintiff's "failure-to-intervene claims—even assuming that the assault lasted less than twenty seconds—were for the jury to decide. … [W]e cannot hold that the assault occurred so quickly that the defendant officers lacked time to intercede as a matter of law." *Id.* at 108. "In light of the officers' placement relative to [plaintiff], the apparent absence of any obstacles that might have hindered their ability to intercede, and the assault's stated duration, a reasonable juror could infer that defendants became, by their inaction, 'tacit collaborator[s]' in the unlawful conduct alleged."

The Court finds *Figueroa* controlling. Whether Defendant Officers had a reasonable opportunity to intervene is a question for the jury. The number of punches or the spontaneity of the force cannot be determined by the Court at this stage. *See also Ross v. Willis*, No. 16-CIV-6704, 2021 WL 3500163, *16 (S.D.N.Y. Aug. 9, 2021). Accordingly, Defendants' motion for summary judgment on the failure to intervene claim is denied.[2]

---

[2] Defendants did not argue that qualified immunity should attach to the failure to intervene claim. In general, "[a] police officer is not entitled to qualified immunity if his failure to intervene 'permitted fellow officers to violate a suspect's clearly established statutory or constitutional rights of which a reasonable person would have known' and 'the failure to intercede [occurred] .... under circumstances making it objectively unreasonable for him to believe that his fellow officers'

**D.**   ***Monell* Liability**

Defendants assert that they are entitled to summary judgment on Plaintiff's *Monell* claim

because Plaintiff has not identified a policy or custom regarding the failure to intervene.  The

Court agrees.

It is well settled that "a municipality cannot be made liable [under § 1983] by application

of the doctrine of *respondeat superior*.'"  *Lucente v. Cty. of Suffolk*, 980 F.3d 284, 297 (2d Cir.

2020) (quotations omitted).  Rather, "[i]n order to hold the County liable under § 1983, plaintiff

must put forth sufficient evidence to show that individual defendants' unconstitutional actions

were taken pursuant to an official municipal policy, custom, or practice." *Thornton v. Cty. of*

*Albany*, No. 9:14-CV-679, 2016 WL 5793714, *7 (N.D.N.Y. Oct. 4, 2016) (citing *Monell*, 436

U.S. at 690–91).  As a result, to demonstrate *Monell* liability, a plaintiff must allege a violation of

constitutional rights by employees of the municipality and "(1) 'the existence of a municipal

policy or custom ... that caused his injuries beyond merely employing the misbehaving officer[s]';

and (2) 'a causal connection - an affirmative link - between the policy and the deprivation of his

constitutional rights.'"  *Harper v. City of New York*, 424 Fed. Appx. 36, 38 (2d Cir. 2011) (quoting

*Vippolis v. Vill. Of Haverstraw*, 768 F.2d 40, 44 (2d Cir. 1985)) (internal quotation marks

omitted).

> A plaintiff may plead a municipal policy or custom by alleging: (1)
> a formal policy, promulgated or adopted by the entity; or, (2) that
> an official with policymaking authority took action or made a
> specific decision which caused the alleged violation of
> constitutional rights; or (3) the existence of an unlawful practice by
> subordinate officials that was so permanent or well settled so as to
> constitute a 'custom or usage,' and that the practice was so

conduct did not violate those rights.'" *Tiffany v. Tartaglione*, No. 00 CIV. 2283, 2004 WL
540275, *4 (S.D.N.Y. Mar. 5, 2004) (citing *Riciutti v. New York City Transit Authority*, 941 F.2d
119, 129 (2d Cir. 1991)).

> widespread as to imply the constructive acquiescence of
> policymaking officials.

*Shepherd v. Powers*, No. 11 Civ. 6860, 2012 WL 4477241, *9 (S.D.N.Y. Sept. 27, 2012)

(quotation and other citation omitted).

Plaintiff seeks to demonstrate a policy or custom in two ways.  First, Plaintiff seeks to

proceed with a "'paradigmatic' *Monell* claim based upon 'formal, written policy.' *Wu v. City of

New York*, 934 F. Supp. 581, 591 (S.D.N.Y. 1996)." Dkt. No. 33 at 22.  Plaintiff identifies the

"Use of Force Policy of the Plattsburgh Police Department" as the written policy, arguing that it

"did not require officers to intervene to prevent the use of unreasonable force by others.  The

policy does not even mention the duty to intervene." *Id.* at 22-23 (citation omitted).

A written-policy-*Monell* claim cannot be buoyed by the absence of a written policy. [3]  *See

Gerte v. Borough of Naugatuck*, No. 3:19-CV-1511, 2021 WL 1165362, *6 (D. Conn. Mar. 26,

2021) ("Since the absence of policy is not a policy within the meaning of this theory of liability,

Plaintiff's Monell claim on the basis of a written policy fails"); *Zachary v. City of Newburgh*, No.

13-CV-5737, 2014 WL 1508705, *5 (S.D.N.Y. Apr. 1, 2014) ("[T]he absence of a policy is not a

policy and is not actionable under *Monell* ...."). Instead, a municipal policy exists when "there is

a decision by an official with policymaking authority, or a formal enactment by the municipality's

governing body." *Scott v. Lazure*, No. 3:19-CV-713, 2020 WL 2615502, *9 (D. Conn. May 22,

2020).  Defendants' lack of a policy, therefore, cannot evince a municipal policy that there is no

---

[3] In their motion for summary judgment, Defendants interpret Plaintiff's *Monell* claim regarding the lack of a policy to intervene as a failure to train claim. *See* Dkt. No. 27 at 4-6; s*ee, e.g.*, *Finch v. City of Stamford*, No. 3:10-CV-748, 2011 WL 5245422, *4 (D. Conn. Nov. 2, 2011) ("[T]he Court cannot imagine a lack-of-policy claim under § 1983 that is not also, and more relevantly, a failure-to-train claim").  In its reply, Plaintiff, however, insists he is not bringing a failure to train claim.  Dkt. No. 33 at 22-23.

duty to intervene.  Municipal policies, of course, cannot preemptively bar every unconstitutional action or else support *Monell* liability.

Second, Plaintiff asserts that there was a custom to not intervene in excessive force cases. *See* Dkt. No. 33 at 23.  Plaintiff points to the deposition of Captain Bradley Kiroy, who testified that the Plattsburgh police department has never disciplined an individual for the failure to intervene. Dkt. No. 27-6 at 289.  "A municipal policy may be pronounced or tacit and reflected in either action or inaction."  *Cash v. County of Erie*, 654 F.3d 324, 334 (2d Cir. 2011).  "In order for Plaintiff to succeed on his … failure to discipline theor[y], there must be a pattern of similar misconduct."  *Davis v. City of New York*, No. 12 CIV. 3297, 2018 WL 10070540, *6 (S.D.N.Y. Mar. 30, 2018) (citing *Connick v. Thompson*, 563 U.S. 51, 62, 131 S. Ct. 1350, 179 L. Ed. 2d 417 (2011)).  The instances of failure to intervene must be sufficient to demonstrate that officers' failure to intervene was so pervasive that it established a "custom or policy."  *Id.* at *7-8.

Captain Kiroy testified that there had been five-to-ten excessive force incidents and that no officer was disciplined for a failure to intervene. Dkt. No. 27-6 at 281, 289.  That testimony alone, however, is well short of demonstrating a pattern of failing to intervene.  There is nothing in the record about the other excessive force cases—specifically, whether there was an opportunity to intervene.  Perhaps there was no discipline because an officer did intervene.  The Court cannot assume that every other excessive force case provided an opportunity to intervene, that an officer did not intervene, and that the department chose not to discipline an officer for a failure to intervene.  Plaintiff's sole reliance on a lack of failure to intervene discipline within the city does not imply a pervasive pattern of a failure to intervene.

Plaintiff's amended complaint also brings *Monell* causes of actions regarding policies or customs of "using excessive force against arrestees and/or detainees" and "not requiring its police

17

officers to attempt de-escalation before using force against detainees or arrestees, including with respect to persons experiencing mental health issues." Dkt. No. 17 at ¶¶ 137, 139. Defendants moved for summary judgment with respect to these claims, as well. *See* Dkt. No. 27 at 11-14. Plaintiff, however, focused his response entirely on the lack of a policy regarding the duty to intervene. *See* Dkt. No. 33 at 22-24. Because Plaintiff does not oppose Defendants' motion for summary judgment as to the additional policies, the Court finds that Plaintiff has abandoned these claims and grants Defendants' motion for summary judgment. *See Crews v. City of Ithaca*, No. 3:17-CV-213, 2021 WL 257120, *13 (N.D.N.Y. Jan. 26, 2021); *Feacher v. Intercontinental Hotels Group*, 563 F. Supp. 2d 389, 399 (N.D.N.Y. 2008); *see also Stokes v. City of New York*, No. 05-CV-007, 2007 WL 1300983, *14 (E.D.N.Y. May 3, 2007) (collecting cases).

## E.      Title II ADA and Section 504 of the Rehabilitation Act

The Second Circuit has recognized that claims made under the ADA and the Rehabilitation Act are so similar that they should be analyzed together. *Weixel v. Bd. of Educ. of City of New York*, 287 F.3d 138, 146 n.6 (2d Cir. 2002). To assert a claim under the ADA or Rehabilitation Act, a plaintiff must establish "that (1) they are 'qualified individuals' with a disability; (2) that the defendants are subject to the ADA; and (3) that plaintiffs were denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or were otherwise discriminated against by defendants, by reason of plaintiffs' disabilities."[4] *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272-73 (2d Cir. 2003). Additionally, in order to recover damages under Title II of the ADA and the Rehabilitation Act, the plaintiff must show that the

---

[4] In addition, to recover under the Rehabilitation Act, "a plaintiff must show that the defendants receive federal funding." *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003).

discrimination was intentional. *See, e.g.*, *Vassenelli v. State Univ. of New York*, No. 5:17-CV-00082, 2018 WL 1406629, *3 (N.D.N.Y. Mar. 19, 2018).

Defendants do not challenge the first prong; that Plaintiff is a qualified individual. A "disability" is defined as a "physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). Defendants state that Plaintiff was first diagnosed with PTSD in 2013, and that PTSD is a qualifying disability under the ADA. *See* Dkt. No. 27 at 16; Dkt. No. 33-1 at ¶ 124. Defendants also do not challenge the second prong. *See* Dkt. No. 27 at 15-16 ("The City of Plattsburgh and the Plattsburgh Police Department are public entities under the ADA"). The Supreme Court has held that state prisons "fall squarely within the statutory definition of 'public entity'" in Title II of the ADA. *Pennsylvania Department of Corrections v. Yeskey*, 524 U.S. 206, 210 (1998); *see also Tardif v. City of New York*, 991 F.3d 394, 404 (2d Cir. 2021) (applying Title II of the ADA to an arrestee's pre-arraignment detention).

Under Title II of the ADA, "[a] public entity discriminates against a qualified individual with a disability when it fails to provide 'meaningful access' to its benefits, programs, or services." *Disabled in Action v. Board of Elections of New York*, 752 F.3d 189, 197 (2d Cir. 2014) (citation omitted). Defendants further state that "post-arrest detainment qualif[ies] as a service, activity or benefit of a police department."[5] Dkt. No. 27 at 17; *see Tardif*, 991 F.3d at 404. "The only reasonable interpretation of Title II is that law enforcement officers who are acting in an investigative or custodial capacity are performing 'services, programs, or activities' within the scope of Title II." *Williams v. City of New York*, 121 F. Supp. 3d 354, 368 (S.D.N.Y. 2015).

---

[5] Because the issue was not contested by the parties, the Court assumes that Plaintiff's detainment qualifies as a service. The Second Circuit, however, has noted that whether "a safe custodial environment" was a "benefit" that the City denied under the ADA is an open question that "has divided our sister circuits." *Tardif v. City of New York*, 991 F.3d 394, 404 n.7 (2d Cir. 2021).

Defendants, however, assert that Plaintiff cannot prove that he was "discriminated against by defendants, by reason of plaintiffs' disabilities[,]" because Defendants did not have knowledge of Plaintiff's disability. *Henrietta D.*, 331 F.3d at 272-73. Additionally, Defendants argue that Plaintiff was not discriminated against because Defendants' actions were reasonable. *See* Dkt. No. 27-3 at 16-24. And lastly, Defendants argue that Plaintiff has failed to demonstrate that the discrimination was intentional, as required for damages under the ADA and Rehabilitation Act. *See Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 275 (2d Cir. 2009).

First, knowledge of a disability is a prerequisite to discriminating by reason of that disability. *See, e.g.*, *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 135 (2d Cir. 2008) ("Obviously, an employer who acts or fails to act without knowledge of a disability cannot be said to have discriminated based on that disability"). Defendant notes that Plaintiff did not testify that he told any officer he had PTSD before the incident, instead he stated that "I can't be confident in saying that I said something beforehand[.]" Dkt. No. 27-4 at 184. Moreover, Defendants correctly note that there is no audible part of the security videos where Plaintiff can be heard telling an officer of his PTSD diagnosis. *See* Dkt. No. 27-3 at 17.

Defendant Vassar, however, told Plaintiff that, "we knew you had PTSD because you told us." Dkt. No. 27-6 at 171. Although, Defendant Vassar also testified at his deposition that he did not recall whether Plaintiff informed any officer of his PTSD before or after the incident, the court nonetheless finds a triable issue of fact. Defendant Vassar had told Plaintiff that, "once we realized that it had triggered [your PTSD] because of your up and down mood and you trying to hang yourself then we had to act." *Id.* at 176. A reasonable inference from that conversation is that the officers knew Plaintiff had PTSD prior to entering his cell. Moreover, Plaintiff was singing about his difficult experience in Afghanistan, and informed Defendant Pond he was on

20

Setraline, a drug to treat PTSD.  Dkt. No. 33-1 at ¶ 217.  Drawing all inferences in Plaintiff's

favor, a jury could reasonably find that Defendants had knowledge that Plaintiff had PTSD.

Next, Defendants argue that no reasonable accommodation was available because of

exigent circumstances.  *See* Dkt. No. 27 at 18-20.  Under Title II of the ADA, a defendant

discriminates when it fails to make a reasonable accommodation that would permit a qualified

disabled individual "to have access to and take a meaningful part in public services."  *Powell v.*

*Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 85 (2d Cir. 2004), *opinion corrected on other grounds*,

511 F.3d 238 (2d Cir. 2004).  "Whether a disabled individual succeeds in proving discrimination

under Title II of the ADA will depend on whether the officers' accommodations were reasonable

under the circumstances."  *Williams*, 121 F. Supp. 3d at 368.  "Title II of the ADA requires police

officers to provide reasonable accommodations to arrestees and that any threatening or exigent

circumstances should be considered when determining the reasonableness of the proposed

accommodation."  *Durr v. Slator*, No. 5:20-CV-00662, 2021 WL 3930704, *17 (N.D.N.Y. Sept.

2, 2021).

In *Durr*, this Court denied a motion to dismiss for a similar Title II ADA claim.  2021 WL

3930704, at *18.  There, the plaintiff alleged that he was "clearly exhibiting signs of an

emotionally disturbed person when Defendants Slator and Silverman arrived on the scene."  *Id.*

"Instead of placing Plaintiff in handcuffs, informing him that he was under arrest, and

subsequently kicking him in the knee," the complaint alleged, "Defendants Silverman and Slator

should have used de-escalation techniques."  *Id.*  Despite the plaintiff "yelling in the roadway, "

"obstructing traffic," and "spitting toward [d]efendant Slator," the Court nonetheless found that a

reasonable accommodation may exist, notwithstanding any exigent circumstance posed by the

plaintiff.  *Id.* at *18-19.

In reaching that conclusion, this Court relied on *Sage v. City of Winooski*, No. 2:16-cv-116, 2017 WL 1100882 (D. Vt. Mar. 22, 2017).  In *Sage*

> the defendant police officers responded to a report of a person trespassing at a local health club.  *See id.* at *1.  When the officers arrived, they were informed by the health club employees that the plaintiff had left the property at their request, but still asked the officers to serve the plaintiff with a notice of trespass.  *See id.* When the officers located the plaintiff and asked to see his identification, the plaintiff responded that they should already know him as a resident of Allen House, which is a group home operated for persons with chronic and persistent serious mental illness.  *See id.*  When the plaintiff declined to provided identification, one of the officers asked the plaintiff if he preferred to be arrested and proceeded to open a handcuff case.  *See id.*  Seeing the handcuff case, the plaintiff struck the officer in the face.  *See id.*  When the other responding officer attempted to grab the plaintiff, he was able to break away from his grasp.  *See id.*  At this point, the officers deployed their tasers on the plaintiff.  *See id.*  While the plaintiff was "flailing" on the ground, one of the officers fired his service weapon, hitting the plaintiff in the leg.  *See id.*

*Durr*, 2021 WL 3930704, at *18.  The *Sage* court denied a motion to dismiss because the plaintiff became violent "only after being threatened with arrest and shown a handcuff case."  *Sage*, 2017 WL 1100882, at *4.  "[M]aking all reasonable inferences in the [p]laintiff's favor, the violent behavior could arguably have been avoided if the officers had acknowledged and accommodated Mr. Sage's mental illness."  *Id.*; *see also Sheehan v. City & Cnty. of San Francisco*, 743 F.3d 1211, 1232-33 (9th Cir. 2014)), *reversed in part on other grounds*, 575 U.S. 600 (2015) (denying summary judgment against a reasonable accommodation claim where the officers could have respected plaintiff's "comfort zone, engaged in non-threatening communications and used the passage of time to defuse the situation rather than precipitating a deadly confrontation").

Here, Plaintiff was secured in a cell where he could be adequately monitored.  Similar to *Sheehan* and *Sage*, Plaintiff was not violent until Defendants initiated the interaction.  And

similarly, Plaintiff argues that Defendants could have accommodated his disability by allowing him to cool off before forcibly removing his shorts.  Whether a reasonable accommodation was available and feasible is a question of fact for the jury.  *See, e.g.*, *Morales v. City of New York*, No. 13 Civ. 7667, 2016 WL 4718189, *6 (S.D.N.Y. Sept. 7, 2016) (availability of accommodation was question of fact, requiring denial of summary); *Wagner v. City of New York*, No. 14 Civ. 2521, 2015 WL 5707326, *7 (S.D.N.Y. Sept. 28, 2015) (same).  With Plaintiff secured in a cell, no exigent circumstance made a reasonable accommodation impossible as a matter of law.

Defendants argue that *Tardif v. City of New York*, compels this Court to grant summary judgment.  991 F.3d 394, 407 (2d Cir. 2021).  The Court disagrees.  In *Tardif*, the plaintiff, a pre-arraignment detainee, was on a strict medication schedule for epilepsy and informed an officer of her medical needs.  *Id.* at 399.  Although the plaintiff received her first dose, she did not receive her second dose, had a seizure, and was transported to the hospital.  *Id.*  The Second Circuit held that Tardif's epilepsy did not cause a deprivation of medical services, it was just the motivation for seeking out such services.  *Id.* at 405.  "The ADA prohibits discrimination because of disability, not inadequate treatment for disability."  *Id.* at 406 (quotation and citation omitted).  The court concluded that no reasonable jury could find that "Tardif's epilepsy substantially caused the City's delay in administering medication," and therefore upheld summary judgment.  *Id.* at 407.

Here, *Tardif* is not instructive.  *Tardif* would preclude an ADA claim for the excessive force itself, not the failure to provide a reasonable accommodation, such as a cooling off period.  The failure to provide such a reasonable accommodation is squarely cognizable under the ADA.  *See e.g., Williams*, 121 F. Supp. 3d at 369 (recognizing a reasonable accommodation claim where

police fail to "reasonably accommodate the person's disability in the course of investigation or arrest, causing the person to suffer greater injury or indignity in that process than other arrestees").  Whereas the failure to provide medical care is a generalized issue that applies beyond the ambit of disability law, the failure to provide reasonable accommodation to a service or benefit—a cooling off period for an individual with PTSD—is a quintessential failure to accommodate disability claim.  Plaintiff does not bring an ADA claim to remain free from excessive force, which would likely fail following *Tardif*.

Lastly, Defendants argue that there is no evidence of intentional discrimination.  "The standard for intentional violations is deliberate indifference to the strong likelihood [of] a violation[.]"  *Loeffler*, 582 F.3d at 275 (quotation omitted).  "[C]ourts in this circuit have found that plaintiffs provided sufficient evidence of deliberate indifference when they could point to training deficiencies of which municipal entities were aware and which existed with respect to populations police would necessarily encounter as they did their duties."  *Felix v. City of New York*, 344 F. Supp. 3d 644, 666 (S.D.N.Y. 2018) (citing *Williams*, 121 F. Supp. 3d at 374–75).

Plaintiff has produced sufficient evidence to create a question of fact as to whether Defendants were deliberately indifferent to the strong likelihood of a violation of the ADA and Rehabilitation Act.  Defendant Ritter testified that they have no departmental policy concerning compliance with the ADA and that he could not recall any ADA-specific training.  Dkt. No. 27-5 at 148.  Indeed, there are no departmental policies regarding the use of force during a mental health incident.  *See* Dkt. No. 33 at 30-31.

Moreover, such a training deficiency relates to a population that police would necessarily encounter as they did their duties, those with a mental disability.  *See, e.g.*, *Felix*, 344 F. Supp. 3d at 666; *Williams*, 121 F. Supp. 3d at 374–75.  Defendants argue that, because of the small

population size of the city of Plattsburgh, approximately 20,000, it is not "morally certain" that its police officers will encounter individuals who require reasonable accommodations for a mental disability.  At the summary judgment stage, however, all inferences must be drawn in the nonmoving party's favor.  A mere reference to the population of the city is insufficient to grant summary judgment and does not provide the Court with the relevant information to determine whether police officers are likely to encounter individuals with mental disabilities.  The Court notes that at least one other recent incident in Plattsburgh involved the use of force and mental health.  *See Passino v. City of Plattsburgh*, No. 8:17-CV-1028S, 2020 WL 509129 (N.D.N.Y. Jan. 31, 2020).

Questions of fact exist whether Defendants' failure to accommodate Plaintiff's disability directly stems from a "deliberate indifference to the strong likelihood [of] a violation[,]" and is an intentional violation of the ADA and Rehabilitation Act.  *Loeffler*, 582 F.3d at 275.  Plaintiff has demonstrated that he was "denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or were otherwise discriminated against by defendants, by reason of plaintiffs' disabilities," and that the discrimination was intentional.  *Henrietta D.*, 331 F.3d at 272-73. Accordingly, Defendants' motion for summary judgment is denied.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendants' motion for summary judgment (Dkt. No. 27) is **GRANTED in part and DENIED in part**;[6] and the Court further

---

[6] Defendants' motion for summary judgment is granted with respect to the excessive force claim against Defendant Minogue and *Monell* liability against Defendant City, and otherwise denied.

25

    **ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: January 14, 2022
      Albany, New York

                                  Mae A. D'Agostino
                                  U.S. District Judge